**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

INGENIEURBÜRO GIEBISCH
& VOLKERT GMBH,

Plaintiff,

v.

ASIMCO INTERNATIONAL,
INC.,

Defendant.

Case No. 16-11760
Hon. Terrence G. Berg

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. 14)

### I.    Introduction

This case arises from a dispute over a contract between a German engineering consulting firm and a Chinese auto parts manufacturer. Plaintiff Ingenieurbüro Giebisch & Volkert GMBH ("IBGV" or "Plaintiff") alleges that it agreed to solicit and procure contracts for the production of certain automobile components on behalf of Defendant ASIMCO International, Inc. ("ASIMCO"), but that Defendant breached the Contract by improperly removing Plaintiff from a project involving the solicitation of a compressor to Daimler AG. Plaintiff also argues, in the alternative, that Defend-

ant was unjustly enriched by Plaintiff's efforts, and seeks compensation for about two years' worth of consulting and project management services it allegedly performed for Defendant. Defendant has moved for summary judgment, which Plaintiff opposes. For the reasons outlined below, Defendant's motion is **GRANTED** in part and **DENIED** in part.

## II.    Background

IBGV is a German engineering and consulting firm headed by Andreas Giebisch ("Giebisch") and Joachim Volkert ("Volkert"). Dkt. 16, Pg. ID 254. Defendant ASIMCO International, Inc. ("ASIMCO") is a subsidiary of ASIMCO Technologies, Ltd. ("ASIMCO HQ"), a Chinese auto parts manufacturer with a number of other subsidiaries. Dkt. 16, Pg. ID 254.

### a. IBGV and ASIMCO Execute a Commission Contract

On August 1, 2012, Plaintiff and Defendant executed a contract (the "Contract") providing that "IBGV will actively represent ASIMCO at the agreed customers/territories on products manufactured or service provided by ASIMCO." Dkt. 16-2, Pg. ID 278. In particular, the Contract stated:

> ASIMCO hereby appoints IBGV as its authorized sales representative for the purpose of soliciting and securing orders on a commission basis for the sale of its products (the "Products'). The assigned accounts and products for IBGV shall be as stated in Appendix A, which can be modified based on mutual agreements between the two parties.

Dkt. 16-2, Pg. ID 278. The agreement provided for a two-year term of duration, beginning on August 1, 2012, and renewing automatically each year for successive one-year periods, unless either party provided notice of its intent to terminate at least 90 days prior to the end of the current term. Dkt. 16-2, pg. ID 281.

Appendix A to the Contract provided that IBGV would be responsible for consulting with Daimler AG (Daimler) and China Spring, in all regions, for a product identified as a "Stabilizer." Appendix A is reproduced below:

| Appendix A | | | |
| --- | --- | --- | --- |
| Customer name | Division | Region | Product |
| Daimler | | all | Stabilizer |
| China Spring | | all | Stabilizer |

Dkt. 16-2, Pg. ID 285.

Testimony in the record shows that during contract negotiation, IBGV sought to obtain a "fixed fee" compensation agreement with Defendant. Dkt. 16-4, Pg. ID 470; *See* Dkt. 16-3, Pg. IDs 337-39. However, the Contract ultimately afforded no fixed fee compensation, but rather included various commission-based methods of compensation. First, the Contract provided that IBGV would receive a commission of 3% for all sales of the services or products

contemplated by the Contract, less returns and allowances. Dkt. 16-2, Pg. ID 280 ¶ 4.1.[1] Second, if IBGV helped ASIMCO increase its sales price, IBGV would share 30% of the increased portion, less certain exclusions. *Id.* ¶ 4.3. Finally, IBGV would be compensated "for business developed by IBGV where IBGV served as an engineering and sales liaison within Europe." *Id.* ¶ 4.4.

The Contract also addressed how the parties could make changes, amendments, and modifications. It provided that all changes, amendments, and modifications shall be: 1) based on mutual agreement by the parties, and 2) in writing. Dkt. 16-2, Pg. ID 284 ¶ 9(D) ("Amendments. This agreement cannot be changed, modified or amended except in writing . . . ."); *Id.* ¶ 10 ("No change or amendment of the agreement shall be effective unless both parties have agreed and executed the change or amendment in written form."). The Parties agree that the Contract, including Appendix A, was never modified in writing as required by paragraphs 9(D) and 10 of the Contract. *See* Dkt. 14, Pg. ID 94; Dkt. 14-3, Pg. ID 123.

## b. Plaintiff Begins Performing Activities For Products Other Than Those in Appendix A

Although Appendix A of the Contract only identifies a "stabilizer" as the product for potential sale to Daimler and China Spring,

---

[1] Paragraph 4.2 allows the parties to increase or decrease the 3% commission rate if "the sales volume is too high or low," provided the change is in writing and confirmed by both parties.

ASIMCO's general manager Wilson Ni ("Ni") conceded in response to a deposition question that IBGV performed work "pursuant to the contract" for customers and products other than those listed in Appendix A:

> **[Counsel] Question:** But the work that IBGV was doing for ASIMCO pursuant to the contract marked as Exhibit 3, it wasn't just the customers and products listed on Appendix A, was it?
>
> **[Wilson Ni] Answer:** Correct. Correct.

Dkt. 16-3, Pg. ID 354.

According to Plaintiff, soon after executing the Contract, Plaintiff and Defendant agreed that Plaintiff would also work to solicit the sale of a compressor to Daimler (the "Compressor Project"). Dkt. 1, Pg. ID 3. Plaintiff maintains that after this new agreement, Plaintiff "immediately went to work to solicit sales of a proposed compressor to Daimler." Dkt. 1, Pg. ID 4. IBGV's efforts allegedly spanned over two years (2012-2015) and included, among other things, travelling to China to visit ASIMCO plants, coordinating staffing and product development strategy, contributing to the development of a compressor prototype, hiring a specialist in connection with the Compressor Project, meeting with Daimler representatives, and maintaining daily communications with Daimler and ASIMCO. *See, e.g.,* Dkt. 16, Pg. ID 263. Plaintiff argues that these activities were in relation to the Compressor Project, as well

as other products for which it was responsible. Dkt. 1, Pg. ID 4; Dkt. 14-3, Pg. ID 142-43.

On January 1, 2014, IBGV entered into a Consultancy Agreement with another division of ASIMCO HQ—ASIMCO Meilian ("Meilian").[2] Dkt. 14-5, Pg. IDs 154-55. Like ASIMCO International, Meilian was a subsidiary of ASIMCO HQ. *See* Dkt. 15-16, Pg. ID 586. Plaintiff and Defendant take different positions as to the meaning and scope of the 2014 Consultancy Agreement, and how it relates to the work Plaintiff did on the Compressor Project for ASIMCO International.

According to Plaintiff, the Consultancy Agreement with Meilian was "unrelated to the work *Plaintiff* was doing on behalf of the Compressor Project, but rather governed the hiring of a 'consultant' for the project, Eberhard Bredel ("Bredel"), whose compensation would be paid by Meilian to Plaintiff, and then to Bredel." Dkt. 16, Pg. ID 257 (emphasis in original) (internal citations omitted). Plaintiff further maintains that the Consultancy Agreement was drafted after "[p]laintiff had already secured the awarding letter from Daimler for the Compressor Project and had been working

---

[2] According to Defendant, ASIMCO Meilian was a limited liability company organized and existing under the laws of the People's Republic of China. Meilian's core business was manufacturing and marketing air compressors to the commercial vehicle industry, including Daimler. Dkt. 14, Pg. ID 87 (referencing Dkt. 14-5, Pg. IDs 151-52).

on the Compressor Project." Dkt. 16, Pg. ID 257-58 (internal citations omitted). Ultimately, Plaintiff argues that the Consultancy Agreement was to pay a consultant, Bredel, for services on behalf of Meilian, and not to compensate Plaintiff for work it had done in relation to the Compressor Project. Dkt. 16, Pg. ID 258.

Defendant argues that the Consultancy Agreement embodies Meilian's agreement to compensate Plaintiff for the same services that Plaintiff now alleges Defendant must pay for under the Contract with ASIMCO International. According to Defendant, the Consultancy Agreement was for IBGV to provide Meilian with technical support and assistance to develop Meilian's European Compressor Business. Dkt. 14, Pg. ID 98. Defendant argues Plaintiff now seeks to "double dip" for its work: "Having received 100,000€ for assisting Meilian in developing the compressor business in Europe, IBGV may not now seek a commission from ASIMCO International for the very same work." Dkt. 14, Pg. ID 98.

### c. Daimler Awards Meilian a 35% Share of the Compressor Project

On January 28, 2014, Daimler provided Meilian an award letter ("Award Letter") for a Modular 1-Cylinder Air Compressor ("the Compressor"). The Award Letter covered Meilian's supplying a 35% share of the compressors needed for Daimler's production facilities in Mannheim and Detroit for the years 2020-25 (and a lesser share

for the years 2016-19) and had an estimated value of 31,000,000 euros. Dkt. 16-6, Pg. ID 551-54. Defendant maintains the award letter was "non-binding" and that Plaintiff "has failed to produce a single order from Daimler to Meilian for a compressor." Dkt. 14, Pg. ID 89.

According to Plaintiff, "when IBGV was working on the Compressor, even though the work was additionally benefitting Meilian, IBGV was doing so for and on behalf of Defendant." Dkt. 16, Pg. ID 259. At his deposition, Ni testified that for over ten years, ASIMCO International would at times be the "seller" and derive its own revenue for international sales of products, even if other ASIMCO companies ultimately produced those products. *See* Dkt. 14-17, Pg. IDs 199-200. However, with respect to the Compressor Project, Ni stated that the seller or supplier of the Compressor was "no longer ASIMCO International but ASIMCO Meilian [was] the seller." Ni also stated Defendant did not inform Plaintiff about the "shifting from ASIMCO International to ASIMCO Meilian." *See* Dkt. 16-3, Pg. IDs 386-87.

Between February 5 and February 7, 2014, Giebisch and ASIMCO HQ's Commercial Department Director, Chen Gang, exchanged several emails and a "matrix" document to "clarify who does what and who is responsible for customer business in Europe." Dkt. 16-12, Pg. ID 573. The last email in this series—sent by Chen

Gang to Giebisch, Volkert, and Ni—indicated that the parties had discussed the issue, and forwarded an updated matrix, which stated that the Daimler Compressor Project was within the scope of work IBGV was to provide for Defendant. Dkt. 16-12, Pg. IDs 572, 576.

### d. IBGV and ASIMCO's Relationship Fractures

A year later, in January of 2015, at ASIMCO's Headquarters in Beijing, ASIMCO informed IBGV that it would no longer be permitted to work on the Daimler Compressor Project. Dkt. 16-17, Pg. ID 630. On January 13, 2015, Wilson Ni advised Daimler that "ASIMCO is determined not to further extend agency contract between ASIMCO and IBGV (ASIMCO Sales Agency for Europe), effecting [*sic*] from Jan. 1st, 2015. From that date, IBGV does not represent ASIMCO in any means." Dkt. 14-12, Pg. ID 178. On January 30, 2015, Giebisch emailed the "Management Teams of ASIMCO," expressing IBGV's shock regarding how the relationship between ASIMCO and IBGV had deteriorated. Dkt. 16-17, Pg. IDs 629-31. Giebisch documented the work and achievements IBGV had accomplished for ASIMCO, including the "[n]omination for Daimler modular air compressor." Dkt. 16-17, Pg. IDs 629-31. Giebisch requested that the parties agree on a statement that could be communicated to customers regarding the change in relationship between ASIMCO and IBGV. *Id.* Giebisch also requested that IBGV be com-

pensated for the work that it had performed. *Id.* at 530-31. On February 18, 2015, Ni responded, stating that the Contract was "to develop the business as shown in appendix A in the contract, which is 'stabilizer'. Due to whatever reasons, ASIMCO has not obtained stabilizer business . . . [How] do you want ASIMCO HQ and ASIMCO International to support you?" Dkt. 16-17, Pg. IDs 627-28. Over the next few months, the parties exchanged additional emails arguing about whether certain work and compensation was within the scope of the Contract. *See* Dkt. 16-17, Pg. IDs 615-26.

ASIMCO sold Meilian's air compressor business to another company in April of 2016. Dkt. 14, Pg. ID 90. After that point, no division of ASIMCO had the capacity to manufacture compressors. On June 17, 2016, Defendant provided IBGV formal notice of termination pursuant to ¶ 7(B) of the Contract. Dkt. 14-16, Pg. ID 188. Giebisch testified at his deposition that he "did not even care about that official termination because we split up before, because after learning we -- we are out of the compressor business we worked for -- for more than two years. There's no reason to continue." Dkt. 14-3, Pg. ID 127. However, Plaintiff notes that the June 17, 2016 termination notice was dated less than 90 days from the term-renewal date of August 2016, rendering the termination ineffective until July 31, 2017. Dkt. 16, Pg. ID 257.

### III.  Standard of Review

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013); *see also* Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

As the moving party, the Defendant has the initial burden to show that there is an absence of evidence to support Plaintiff's case. *Selby v. Caruso*, 734 F.3d 554 (6th Cir. 2013); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the non-moving party "may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Ellington v. City of E. Cleveland*, 689 F.3d 549, 552

## IV. Analysis

Plaintiff alleges four causes of action in the Complaint: Breach of Contract, Unjust Enrichment / Quantum Meruit, Promissory Estoppel, and Action for Unpaid Sales Commissions. Dkt. 1, Pg. IDs 8-12.

### a. Breach of Contract

A party must establish three elements by a preponderance of the evidence to prevail on a breach of contract claim: 1) that a contract exists, 2) that another party breached the contract, and 3) that damages were suffered as a result of the breach. *Miller-Davis Co. v. Ahrens Constr. Inc,* 495 Mich. 161, 178 (2014) (internal citations omitted). A valid contract requires: 1) parties competent to contract, 2) a proper subject matter, 3) legal consideration, 4) mutuality of agreement, and 5) mutuality of obligation. *AFT Michigan v. State of Michigan*, 497 Mich. 197, 235 (2015).

Plaintiff argues it entered into a contract with ASIMCO International to act as Defendant's sales representative and solicit contracts for the production of certain automotive components. *See* Dkt. 1, Pg. ID 8. While the original Contract required amendments and modifications in writing, Plaintiff argues that the parties orally agreed that the contract encompassed products and clients beyond those enumerated in Appendix A—such as the solicitation of a com-

pressor to Daimler. *See, e.g.,* Dkt. 16, Pg. IDs 265-66. Plaintiff maintains Defendant breached the Contract by unilaterally removing Plaintiff from working on the Compressor Project after Plaintiff had worked to secure a sale for over two years, thereby foreclosing any opportunity to earn commissions on compressors sold under the contract. Dkt. 1, Pg. ID 8; Dkt. 16, Pg. ID 268. Plaintiff argues that by doing so, Defendant violated the plain language of the contract, which required that any changes to the customers and products covered would be mutually agreed upon. Dkt. 16, Pg. ID 259. Plaintiff further argues that the removal of IBGV from the Compressor Project and the subsequent sale of Meilian frustrated the purpose of the Contract, rendered payment of commissions impossible, and thereby entitled IBGV to restitution for its efforts in connection with the Compressor Project, regardless of whether any compressors were sold. Dkt. 16, Pg. ID 268.

Defendant advances two main arguments in reply to Plaintiff's Breach of Contract claim. First, Defendant argues that all alleged breaches are premised on the assumption that the Contract includes "compressors," but the Contract does not provide for commissions for the sale of compressors to Daimler. Dkt. 14, Pg. ID 93. Defendant relies on Appendix A of the Contract, which identifies only one product—a stabilizer. *Id.* Defendant further contends that the Contract required all amendments, changes, and modifications

to be in writing, and that the contract was never amended in writing. *Id.* at 94, 96. Defendant argues that although the parties discussed adding compressors, the parties never established mutual assent to do so. *Id.* In support, Defendant cites to Wilson Ni's testimony that once he "found out that IBGV had signed contract [with] ASIMCO Meilian for compressor," there was "no point to continue to do the modification of the contract anymore." Dkt. 19, Pg. ID 645 (citing Dkt. 14-17, Pg. ID 213).

Second, Defendant argues that even if the Contract was amended to include compressors sold to Daimler, IBGV suffered no damages because ASIMCO International never sold any compressors to Daimler that would have entitled IBGV to commissions. Dkt. 14, Pg. ID 96. Defendant again points to the Contract, and argues that Plaintiff would only be entitled to compensation *if* compressors were sold to Daimler in connection with Plaintiff's efforts.

i. *Michigan Law Allows for Non-Written Modifications Even When a Contract Contains a Preclusive Modification Provision*

Although Defendant is correct that the Contract requires that all modifications be in writing, Michigan law provides that a written contract may be modified by subsequent oral agreements or by conduct, even when the original contract requires only written modifications. In *Quality Products and Concepts Co. v. Nagel Precision, Inc.,* the Michigan Supreme Court stated:

14

[I]t is well established in our law that contracts with written modification or anti-waiver clauses can be modified or waived notwithstanding their respective amendment clauses. That is because the parties possess, and never cease to possess, the freedom to contract even after the original contract has been executed . . . [A] party alleging waiver or modification must establish a mutual intention of the parties to waive or modify the original contract.

\*\*\*

The mutuality requirement is satisfied where a modification is established through clear and convincing evidence of a written agreement, oral agreement, or affirmative conduct establishing mutual agreement to waive the terms of the original contract.

469 Mich. 362, 372-73 (2003) (internal citations omitted). The Court explained that an alleged modification must evidence a mutual agreement by the parties to "modify the *particular* original contract, including its restrictive amendment clause[]." *Id.* (emphasis in original).

Thus, the rule of law regarding this issue is clear. Michigan law provides a mechanism for contracting parties to amend, change, or modify the terms of an existing agreement—orally or through conduct—notwithstanding a "written modifications only" provision. *See id.* Parties with mutual assent may amend the terms of a written contract orally even where the contract itself requires amendments to be in writing. Applying this rule to the facts of this case is more difficult, however, because the factual circumstances

surrounding the purported amendment to the Contract are less clear.

    *ii.   Genuine Issues of Material Fact Surrounding the Scope of the Purported Amendment*

It is unclear from the record whether the parties successfully amended the Contract pursuant to Michigan law. Genuine issues of material fact exist surrounding: 1) whether the parties established mutual assent to amend the Contract to include the solicitation of compressors to Daimler, and 2) whether the parties mutually agreed to modify the restrictive "written amendments only" clause. There also exists a genuine issue of material fact about whether the parties' course of conduct establishes that the parties knowingly waived enforcement of the Contract's "written amendments only" clause.

Some evidence supports a finding that the parties modified the Contract to include the solicitation of compressors to Daimler. For example, Giebisch testified that the parties discussed and agreed to modify the Contract to include compressors within the scope of Appendix A, but that the contract was never formally amended in writing. Dkt 16-4, Pg. IDs 456-57. Similarly, Ni testified that IBGV's work for Defendant, "pursuant to the Contract," extended to customers and products beyond those listed in Appendix A. Dkt. 16-3, Pg. ID 354. Ni explained that Defendant intended

to modify the contract "and add the compressor into it" in writing because the contract only indicated the stabilizer, "which was not sufficient enough." Dkt. 16-3, Pg. ID 373. According to Ni, Defendant ultimately chose not to amend the contract in writing because Ni became upset with Plaintiff for allegedly going behind Ni's back to obtain the Consultancy Agreement with Meilian. Dkt. 16-3, Pg. ID 358-59. However, Ni does not unequivocally maintain that the parties had *never* reached a meeting of the minds that Appendix A effectively included the sale of compressors to Daimler, even if that mutual assent was not reduced to writing.

However, a mere meeting of the minds to change some elements of a contract will not operate to modify a contract with a "written modifications only" provision unless that meeting of the minds includes an agreement to amend the restrictive provision itself. *See Quality Products*, 469 Mich. at 373 ("… a party advancing amendment must establish that the parties mutually intended to modify the *particular* original contract, including its restrictive amendment clauses.") (emphasis in original). The record reflects the following selected interactions between the parties:

| Truncated Timeline of Interactions Between IBGV and ASIMCO | |
|---|---|
| **Date** | **Interaction** |
| Aug. 12, 2012 | • The Parties execute the first commission-compensation Contract. |
| April 16, 2013 | • Plaintiff emails Chen Gang, ASIMCO HQ's Commercial Department Director, and others at various ASIMCO companies about meeting with Daimler regarding the solicitation of compressors. Dkt. 16-5, Pg. ID 549. |
| July 31, 2013 | • ASIMCO indicates it has signed a "sales agency agreement with a Germany company (GV)" for its European Market Development Dkt. 16-14, Pg. ID 581. |
| Jan. 1, 2014 | • ASIMCO Meilian and IBGV execute the Consultancy Agreement. |
| Jan. 23, 2014 | • Chen Gang emails IBGV indicating that Daimler wants to know if IBGV is ASIMCO's "current agent." Dkt. 16-12, Pg. ID 574-75.<br>• Chen Gang requests IBGV to amend Appendix A and sign it. *Id.* |
| Feb. 5, 2014 | • Giebisch emails Chen Gang a draft "matrix" document showing products and companies to be solicited to "clarify who does what . . ." Dkt. 16-12, Pg. IDs 572-74.<br>• Giebisch states the parties can "discuss update of contract." *Id.* at 573. |
| Feb. 7, 2014 | • Chen Gang emails an updated matrix to IBGV after a referenced discussion between the parties. Dkt. 16-12, Pg. IDs 572, 576.<br>• The matrix indicates that the Daimler Truck Compressor is within the "Scope of IBGV." Dkt. 16-12, Pg. ID 576.<br>• These emails contain no indication from Giebisch, Chen Gang or Ni that Appendix A needed to be updated and signed to incorporate the new product, as Chen Gang had previously requested in his January 23, 2014 email. |

As shown above, initially, even after the parties appeared to agree that Compressors were within the scope of the original Contract, they continued to express concern that Appendix A needed to be amended in writing and signed to reflect the new agreement. *See, e.g.,* Dkt. 16-12, Pg. ID 574-75. This part of the record suggests

that the purported amendment did not go so far as to amend the Contract's restrictive modification clause. *See Quality Products*, 469 Mich. at 373.

However, the record also shows that after exchanging the updated matrix on February 7, 2014, Chen Gang omits the request he previously made asking that Appendix A be amended to reflect the products and customers in the matrix. A jury could interpret the parties' statements and the matrix as evidencing a written agreement between the parties about the products and customers to be included within the scope of the Contract. If so, a jury could find that the matrix reflects "clear and convincing evidence of conduct [that] overcome[s] not only the substantive portions of the previous contract allegedly amended, but also the parties' express statements regarding their own ground rules for modification . . . as reflected in any restrictive amendment clauses." *Quality Products,* 469 Mich. at 374. Moreover, a jury could also find that the absence of a statement regarding a need to amend Appendix A shows by clear and convincing evidence that Defendant knowingly waived enforcement of the "modifications-in-writing-only" clause. *See Quality Products*, 469 Mich. at 374; Dkt. 16-2, Pg. ID 284 ¶¶ 9(D), 10.

### iii. *Defendant's Alleged Breach and Damages*

In its complaint, Plaintiff alleges ASIMCO breached the Contract by, among other things, unilaterally removing IBGV from the Compressor Project. Dkt. 1, Pg. ID 8. Plaintiff develops its position by arguing:

> [A]fter two years of work on the Compressor Project, but before any sales were made to Daimler, Defendant unilaterally removed IBGV from the project in derogation of the Contract, which provides that customer and product assignments may be 'modified based on *mutual* agreements between the two parties . . . As a result of the breach of this provision, IBGV was plainly damaged as it was unable to continue work on the Project, and foreclosed the opportunity for payment of agreed-upon sales commissions.

Dkt. 16, Pg. ID 266 (internal citations omitted) (emphasis in original).

Defendant argues that Plaintiff has no damages because Defendant has not sold any compressors to Daimler and therefore does not owe Plaintiff any commissions. Dkt. 14, Pg. ID 96. Defendant's argument misses the mark. Plaintiff's breach of contract claim does not seek damages for sales commissions in connection to any compressors. In fact, Plaintiff acknowledges no compressors were sold. Dkt. 16, Pg. ID 273. Rather, Plaintiff argues Defendant breached the Contract by unilaterally removing Plaintiff from the Compressor Project in derogation of the Contract. According to Plaintiff, it suffered damages because it was unable to continue to work on the

Project, which foreclosed the opportunity for it to obtain the benefit for which it bargained. *See, e.g.,* Dkt. 16, Pg. IDs 265-66.

As explained above, genuine issues of material fact exist regarding whether the parties successfully amended the Contract to properly include compressors. On the one hand, a jury could find that the parties mutually intended to modify the original Contract, including its restrictive amendment clause, such that the Contract included the solicitation of compressors to Defendant. If a jury so found, it could also find Defendant breached the amended agreement by unilaterally removing Plaintiff from continuing its work on the Compressor Project, which prevented Plaintiff from effectuating a final sale and obtaining commissions. On the other hand, a jury could also find that there exists no clear and convincing evidence that the parties mutually agreed to modify the Contract including the restrictive modification clause, and that no breach occurred.

As explained above, there are a number of genuine issues of material fact that need to be resolved to determine Plaintiff's breach of contract claim. Consequently, Defendant's motion for summary judgment on Plaintiff's breach of contract claim will be DENIED.

### b. Plaintiff's Frustration of Purpose Theory

In its response to Defendant's Motion for Summary Judgment, Plaintiff, for the first time, argues that its removal from the Compressor Project and the subsequent sale of Meilian "frustrated the purpose" of the parties' Contract, thereby entitling Plaintiff to restitution. Dkt. 16, Pg. IDs 267-69. Plaintiff relies on §§ 265 and 377 of the Restatement (Second) of Contracts in support of this claim.[3] Michigan courts have recognized the viability of claims for restitution under a frustration of purpose theory as set out in § 377. *See Jabero v. Harajli*, No. 243494, 246737, 2004 WL 1335896, at *3 (Mich. Ct. App. June 15, 2004); *see also Liggett Restaurant Group v. City of Pontiac,* 260 Mich.App. 127, 142 n.2 (Mich. Ct. App. 2003).

Defendant advances procedural and substantive arguments in response. Procedurally, Defendant argues that Plaintiff failed to allege frustration of purpose in its Complaint and maintains that claims not alleged in the complaint cannot be presented for the first

---

[3] Section 265 provides for the discharge of contractual performance where "after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made." Restatement (Second) of Contracts § 265 (1981).

Section 377 provides, "A party whose duty of performance . . . is discharged as a result of . . . frustration of purpose is entitled to restitution for any benefit that he has conferred on the other party by way of part performance or reliance." Restatement (Second) of Contracts § 377 (1981).

time in a response brief. Dkt. 19, Pg. ID 647 (citing *Hertel v. Mortgage Electronic Registration Systems, Inc.*, 2013 WL 1874718, at *9 (W.D. Mich. May 3, 2013)). Substantively, Defendant maintains that Plaintiff cannot recover under a frustration of purpose theory because "it was foreseeable that compressors could be removed or the Contract could be terminated." Dkt. 19, Pg. ID 648. As to this substantive argument, there is a sufficient factual question in the record as to whether the sale of Meilian and unilateral jettisoning of ASIMCO's capacity to manufacture compressors was foreseeable to the parties. Defendant's procedural argument requires consideration of the doctrine's viability under Michigan law.

Few published cases exist addressing the frustration of purpose doctrine under Michigan law. *See City of Flint v. Chrisdom Properties, Ltd.,* 283 Mich.App. 494, 499 (Mich. Ct. App. 2009) (noting the dearth of case law). Indeed, the cases addressing frustration of purpose note that the doctrine is generally asserted as a *defense* to a breach of contract claim, rather than as an affirmative basis of relief. *See, e.g., Liggett Restaurant Group v. City of Pontiac,* 260 Mich.App. at 133-34. Nevertheless, the Restatement provides that a party is entitled to restitution for any benefit that he has conferred on another party when its duty of performance has been discharged due to frustration of purpose:

> A party whose duty of performance does not arise or is dis-
> charged as a result of impracticability of performance, frus-
> tration of purpose, non-occurrence of a condition or disclaimer
> by a beneficiary is entitled to restitution for any benefit that
> he has conferred on the other party by way of part perfor-
> mance or reliance.

Restatement (Second) of Contracts § 377. Comment a, detailing the scope of § 377, explains that "[a] party whose duty of performance is discharged . . . [due to] frustration of purpose (§ 265) may already have performed in part or otherwise relied on the contract before the occurrence of the supervening event . . . Under the rule stated in this Section such a party is entitled to restitution." Restatement (Second) of Contracts, § 337, cmt. a. Given that Michigan courts in *Jabero* and *Liggett* have recognized claims for restitution under a frustration of purpose theory as described in § 377 of the Restatement, such claims may be properly pled. *See Jabero v. Harajli*, No. 243494, 246737, 2004 WL 1335896, at *3 (Mich. Ct. App. June 15, 2004); *see also Liggett*, 260 Mich.App. at 142 n.2.

Here, however, Plaintiff has failed to allege this claim in its Complaint, so the Court may not address Plaintiff's claim for resti-tution based on a frustration of purpose theory. *See* Dkt. 1. In order for the Court to properly consider Plaintiff's claim for restitution, it would be necessary for Plaintiff to amend its Complaint.

Rule 15 of the Federal Rules of Civil Procedure, governing amendment of pleadings, permits a plaintiff to amend a complaint

once as a matter of right before a responsive pleading is filed, and afterward, "only with the opposing party's written consent or the court's leave." *See* Fed. R. Civ. P. 15(a)(1)-(2). District courts have the discretion to grant or deny leave to amend, but are directed to "freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "[T]he thrust of Rule 15 is to reinforce the principle that cases should be tried on their merits rather than the technicalities of pleadings." *Moore v. City of Paducah*, 790 F.2d 557, 559 (6th Cir. 1986). A court may deny a motion to amend where there is evidence of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Forman v. Davis*, 317 U.S. 178 (1962).

Thus, in order to determine whether the Court shall address Plaintiff's claim for restitution, the Court directs Plaintiff—within seven (7) days from issuance of this order—to seek Defendant's written consent to amend its complaint pursuant to Fed. R. Civ. P. 15(a)(2), if Plaintiff so chooses. If Defendant does not consent, the Plaintiff is hereby given leave to file, with fourteen (14) days, a motion for leave to amend its Complaint, detailing whether leave to

amend should be granted. Plaintiff shall attach to the motion a proposed amended complaint. Defendant must reply within fourteen (14) days. After reviewing the arguments and authorities of the parties, the Court will decide whether to allow the amendment.

### c. Plaintiff's Equitable Claims: Unjust Enrichment and Promissory Estoppel

Plaintiff brings claims for unjust enrichment/quantum meruit and promissory estoppel in the alternative. Dkt. 1, Pg. IDs 9-11; Dkt. 16, Pg. IDs 270-73. Because Plaintiff's unjust enrichment and promissory estoppel claims are subject to the same analysis, they will be addressed together.

In support of its unjust enrichment claim, Plaintiff argues that from August 2012 through January 2015 it worked on the Compressor Project: it engaged in customer meetings and calls; communicated with Daimler departments on a daily basis; cultivated a relationship between Defendant and Daimler; made contributions to developing a compressor prototype, and "generally operated as the project manager for Defendant on the Compressor Project. Dkt. 16, Pg. ID 271-72. Accordingly, Plaintiff maintains that the Court should "imply a contract to compensate IBGV by disgorging Defendant of the benefit provided by IBGV." Dkt. 16, Pg. ID 270. Plaintiff details the work that it allegedly performed on the Compressor Project, arguing that it worked to "develop Defendant's

business in Europe," and details what it purports to be the value Defendant retained as a result of Plaintiff's alleged work during that period of time. Dkt. 16, Pg. IDs 270-72.

With respect to its promissory estoppel claim, Plaintiff argues that Defendant:

> [M]ade a clear and definite promise or promises to IBGV that (a) ASIMCO would pay IBGV a sales commission as a result of IBGV's work on the Compressor, and (b) IBGV would operate as ASIMCO's authorized sales representative with respect to Daimler and the Compressor unless and until the parties mutually agreed to modify the arrangement.

Dkt. 1, Pg. ID 10. Plaintiff maintains that it relied on Defendant's promises that it would be compensated for the work it performed and that a contract between the Parties would be amended in writing. Dkt. 16, Pg. ID 273.

In response, Defendant argues that Plaintiff's equitable claims are barred by the existing Contract. Dkt. 14, Pg. ID 99. Defendant argues that unjust enrichment and promissory estoppel are "not applicable when the parties are bound by an express written agreement." Dkt. 14, Pg. ID 101 (citing *APJ Associates, Inc. v. North American Philips Corp.*, 317 F.3d 610, 617 (6th Cir. 2003)). Defendant explains that "[g]enerally, an implied contract may not be found if there is an express contract *between the same parties* on the same subject matter." *Id.* at 99 (citing *Morris Pumps v. Centerline Piping,*

*Inc.,* 273 Mich.App. 187, 194 (Mich. Ct. App. 2006) (internal citations omitted) (emphasis in original)). Alternatively, Defendant argues that if the Contract was amended to include IBGV's efforts to sell compressors to Daimler, then the Contract would preclude IBGV's recovery under an unjust enrichment or quantum meruit theory. *See* Dkt. 14, Pg. ID 99 (internal citations omitted).

Michigan law provides that a party cannot recover on equitable theories such as unjust enrichment and promissory estoppel when an express contract governs the parties' relationship and covers the same interactions for which Plaintiff seeks equitable relief. *See, e.g., Terry Barr Sales Agency, Inc. v. All-Lock Co., Inc.,* 96 F.3d 174, 183 (6th Cir. 1996) (citing *Cascade Elec. Co. v. Rice,* 70 Mich.App. 420, 426-27 (1976)). While there is an exception to this general rule in instances where recovery is sought for items not contemplated in the original contract, that narrow exception does not apply in this case. *See id.*

Here, the record shows that the original Contract did in fact contemplate how products and customers beyond those listed in Appendix A may be added. The Contract states that "[t]he assigned accounts and products for IBGV shall be as stated in Appendix A, which can be modified based on mutual agreements between the two parties." Dkt. 16-2, Pg. ID 278. Therefore, while the original contract did not specifically address the solicitation of compressors

for Daimler, it did contemplate such an eventuality by providing a mechanism for the parties to amend the Contract to add new products and customers.

Having carefully reviewed the record and the parties' arguments, the Court finds that the parties had an enforceable contract that contemplated the issues about which Plaintiff seeks equitable relief. Defendant is therefore entitled to summary judgment on Count II (Unjust Enrichment/Quantum Meruit) and Count III (Promissory Estoppel). *See, e.g., Terry Barr Sales Agency*, 96 F.3d at 181.

### d. Action for Unpaid Sales Commissions

In its response to Defendant's Motion for Summary Judgment, Plaintiff concedes, "no sales were made of the Compressor to Daimler, as a result of the sale of Meilian and the frustration of purpose of the Parties' Contract." Dkt. 16, Pg. Id 273. There is consequently no genuine issue of material fact as whether any sales commissions were earned but not paid—both sides recognize they were not. Consequently, as to Count IV of Plaintiff's complaint seeking unpaid sales commissions, Defendant is entitled to Summary Judgment on this claim.

### V. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. 14) is **GRANTED** with respect to Counts II, III, and

IV, and **DENIED** with respect to Count I. The Court also directs Plaintiff to seek Defendant's written consent to amend its complaint within seven (7) days from issuance of this order, if Plaintiff so chooses. If Defendant does not provide consent, the court hereby **GRANTS** Plaintiff leave to file a motion to amend its complaint.

**SO ORDERED.**

Dated: December 21, 2017  s/Terrence G. Berg
            TERRENCE G. BERG
            UNITED STATES DISTRICT JUDGE

**Certificate of Service**

I hereby certify that this Order was electronically filed, and the parties and/or counsel of record were served on December 21, 2017.

        s/H. Monda
        Case Manager
        in the absence of A. Chubb